**TOILOLO SIU, Plaintiff/Objector and Counter-Claimant**

v.

**POTI AMOSA, Defendant/Claimant and Counter-Defendant**

High Court of American Samoa
Land and Titles Division

LT No. 48-91

February 23, 1993

Before RICHMOND, Associate Justice, VAIVAO, Associate Judge, AFUOLA, Associate Judge.

Counsel:        For Plaintiff/Objector and Counter-Claimant,
Afoa L. Su'esu'e Lutu
For Defendant/Claimant and Counter-Defendant,
Tauese P.F. Sunia

This action was generated out of competing claims by the Toilolo and Poti families to ownership of certain land as their communal land. Testimony at the trial was taken on November 20 and 23, 1992. Both parties were present with counsel. Without the counsel's presence, by stipulation, the court made a rain-abbreviated inspection of the land on November 27, 1992, and two members (the third then being off-island) viewed it again on December 4, 1992.

## FINDINGS OF FACT

The land at issue, consisting of approximately 0.7529 of an acre, is a portion of a larger tract known as "Niualuga" and is situated in the Village of Failolo, American Samoa.

The land was surveyed on September 6, 1990, at the request of defendant Poti Amosa ("Poti"), the senior chief ("sa'o") heading the Poti family. The survey is set forth in Drawing No. 100-15-90 of the Land and Survey Branch of the American Samoa Government. On September 13, 1990, a surveyor and pulenu'u certificate[1] was issued, as required under A.S.C.A. § 37.0102(c). On January 18, 1991, Poti offered the land for registration by the Territorial Registrar.[2] In accordance with

---

[1] A pulenu'u serves in a position authorized by A.S.C.A. § 5.0301 and, having duties set forth in A.S.C.A. § 5.0302 and other statutes, is roughly the equivalent of a mayor of a municipality.

[2] The offer proposed registration as land "individually owned" by the Poti family. The potential confusion engendered by this terminology with the recognized category of land known in American Samoa as "individually owned land" belonging to a person having at least one-half Samoan blood, as distinguished from "communal land" owned by an extended Samoan family without any title rights in individuals, was adequately dispelled by three factors: Poti's testimony that he intended registration as communal land, the reference to the "Poti family" in the offer itself, and the entire circumstances pertaining to the registration effort.

131

A.S.C.A. § 37.0103, the notice for proposed registration of land was posted for 60 days, beginning January 18, 1991, in Failolo and at the court house.

On January 30, 1991, plaintiff Toilolo Siu ("Siu"), as the purported sa'o of the Toilolo family,[3] objected to the registration. The Territorial Registrar referred the registration controversy to the Secretary of Samoan Affairs for dispute-resolution proceedings under A.S.C.A. § 43.0302. The Deputy Secretary of Samoan Affairs issued a certificate of irreconcilable dispute on August 7, 1991; and on August 8, 1991, in accordance with A.S.C.A. § 37.0104, the Territorial Registrar submitted the matter to the High Court for adjudication.

On August 20, 1991, notice, captioned "Toilolo Siu, Plaintiff, v. Poti Amosa, Defendant," was issued by the clerk of courts, instructing objectors to move forward with their objections within 20 days after receipt of the notice or face dismissal of the case. The notice prompted Poti to file his quiet-title complaint first, which was followed by Siu's answer and counterclaim to quiet title.

This is one of those cases in which the contestants have offered oral family history and tradition of occupancy and cultivation as a basis for establishing title to the same parcel of land. Although largely hearsay, such evidence is necessary in a communal land-tenure system which commonly lacks title documentation and is, therefore, admissible. *Tupuola v. Tu'ufuli*, 1 A.S.R.2d 80 (1983). However, without more substantial evidence, the result can readily be a standoff in which neither the claimant nor the objectors meet their respective burdens of proving title. *Toilolo v. Galoia*, 4 A.S.R. 719 (1966). More substantial evidence is before us in this case.

---

[3] Although not affecting our decision on which family owns the land at issue, we take special note that Siu is a citizen of Western Samoa, born in that country of parents who were not inhabitants of American Samoa. As such, he is ineligible, under A.S.C.A. § 1.0403(a), to hold this matai ("chief") title. Thus, the Toilolo title was bestowed on him contrary to the provisions of A.S.C.A. §§ 1.0401-1.0414 and cannot be registered or otherwise recognized as Siu's title under A.S.C.A. § 1.0413. His use of the Toilolo matai title is also a criminal act under A.S.C.A. § 1.0414.

The physical configuration of the land at issue indicates that it is the Toilolo family's communal land. The east and west sides have straight, virtually exact north-south boundaries. The creek along the west side is a natural boundary. The boundary on the east is akin to a systematic subdivision lot. Moreover, the eastern surveyed boundary bisects a Toilolo family's house. The size of the plot is relatively small. Taken together, these circumstances support the logical inclusion of the land with the contiguous Toilolo family's communal land immediately to the east. However, other circumstances are persuasively to the contrary.

This litigation is the second recent action involving the land at issue. In 1988, registration as Toilolo communal land was sought for a surveyed parcel called "Niualuga and Lalomilo." The survey had been obtained by Toilolo Laufau, then the sa'o of the Toilolo family, before he passed away in the same year. Misa Taliloa ("Misa"), sa'o of the Misa family, objected to the registration, claiming that portions of the surveyed land encroached upon the Misa family's communal land. Poti objected with respect to the land at issue, which was also encompassed within this survey. Suit followed in 1990. In 1991, the three contestants agreed to its dismissal with prejudice, and Misa obtained registration of the land surveyed as the Misa family's communal land without any objections. Poti's claim that the land at issue is the Poti family's communal land is discernible in these events.

At the time of Poti's survey of the land at issue, Siu was, and still is, the pulenu'u of Failolo. Although he was not present when Poti showed the boundaries of the land to the surveyor, Siu was there at the beginning of the survey. Later he signed the surveyor and pulenu'u certificate. Even though he testified that Misa brought the certificate to him for his signature and he thought it pertained to the Misa family's communal land, his denial of knowing the purpose of Poti's survey is incredulous.

Most important, however, is the actual use of the land at issue. The Toilolo family's oral history and tradition placed the family guest-house in the southeast corner of the land. Other witnesses claimed that the site of this guest-house was located on higher ground, according to custom, to the east. Both families presented contradictory evidence of current cultivation. Coconut trees are lined along most, perhaps all, of the shoreline in the village; but they are mature, and the planters' identity is obscured.

Long-term occupancy by Poti family members is clearly established. According to the evidence, they may have first resided on the land as far back as 1942, but no later than 1948. This residency was undertaken without any permission by the Toilolo family's sa'o then or later in office. Although occasional departures by some sa'os of the Poti family have occurred for relatively protracted periods, they were apparently prompted by village or other issues unrelated, except in instances involving Siu, to ownership of the land at issue, and the Poti family's possession of the land has been continuous to the present time.

Two houses, both constructed by Poti family members, are wholly within the surveyed site. Poti, who was born on the land, has lived most of his life in one of those houses, which is actually erected on the Toilolo family's claimed guest-house site. His father and grandfather also lived in this house. Poti moved to a relative's house in another village after Hurricane "Ofa" rendered this house uninhabitable in 1989, but he had no intention of vacating the land.

The other house was built in 1972-1973 for Poti's cousin, the granddaughter of a former sa'o of the Poti family, who authorized the construction. We are not persuaded by Siu's claim that he selected this site by direction of the sa'o then heading the Toilolo family. After she relocated outside of American Samoa, the Poti family's sa'o first permitted a sister of a former sa'o of the Toilolo family and later her brother, who is still there, to live in this house. The Toilolo family has never voiced any claim to own or objection to the presence of either of these houses.

Two graves are located on the land. One is the burial site of Poti's grandmother and is covered with concrete. The other is less substantial, marked only by stones. Apparently, Toilolo family members are buried there. Although the testimony differed, they may include the parents of one witness, who is now 69 years old and lived on the land with them at one time, and a grandson of his sister, who wanted her grandson buried with his great-grandfather. However, the traditional Toilolo family's burial grounds are located elsewhere in Failolo.

A dispute over the land involving Siu and a former Poti family sa'o occurred on or about December 20, 1968, when Siu moved back, after an extended absence, from Western Samoa to American Samoa. Initially, this quarrel concerned the plantations on the land. Siu claimed that, in 1969, this sa'o of the Poti family agreed to remove his plantations and moved to Hawaii. Siu also testified to continued strife

with the next Poti family's sa'o the following year, when Siu began to build the house now bisected by the surveyed boundary on the east side of the land. On both occasions, the Secretary of Samoan Affairs and the Western District Governor apparently became involved in settling matters.

Siu's asserted role of prominence in Toilolo family affairs so quickly after arriving from Western Samoa seems improbable. However, even if these events occurred more or less as he described them, at most they only disrupted relationships between the Toilolo and Poti families. They did not interrupt the Poti family's continuous possession of the land at issue. By 1968, the Poti family had been in open, notorious, hostile, exclusive and continuous possession of the land for at least 20 years, and possibly as long as 26 years. In fact, the Poti family continued in possession adverse to any claim that the Toilolo family may have had to owning the land until this action was commenced. Thus, this period extended over 43 years to 49 years, well in excess of the 30-year period presently required under A.S.C.A. § 37.0120(a).

It is true that there are interrelationships through marriages between the Toilolo and Poti families. Poti is a high-talking-chief matai title, while Toilolo is one of two high-chief titles, along with Misa, in Failolo. In this capacity, the Poti titleholder customarily performs service or "tautua" to and speaks on behalf of the Toilolo titleholder. However, in spite of these connections, we are satisfied that the two families are independent of each other for purposes of owning communal land and acquiring title from one another by adverse possession. Therefore, except as noted below, we find as the ultimate fact in this action that the land at issue is the Poti family's communal land.

The Toilolo family claims, and the Poti family acknowledges, that both the house bisected by the eastern surveyed-boundary line and the house which is apparently touched at one corner by that boundary line are owned by the Toilolo family. Thus, we further find that the Poti family have relinquished the portions of the land occupied by these houses to the Toilolo family. Fairness dictates that the eastern boundary line be relocated at least ten feet away from all points along the outside roof-lines of those two houses and be resurveyed, at the Poti family's expense, for that purpose.

## CONCLUSION OF LAW

Upon completion of the resurvey, with the eastern boundary modified in accordance with the findings of fact above, Poti is entitled to registration of the title to the land at issue, and the Territorial Registrar shall register that title as the communal land of the Poti family.

Judgment shall enter accordingly. It is so ordered.